## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## NORTHERN DIVISION

KATRINA WILSON                                                          PLAINTIFF

VS.                              No. 3:20-cv-00168 PSH

ANDREW SAUL, Commissioner,
   Social Security Administration                              DEFENDANT

## ORDER

Plaintiff Katrina Wilson ("Wilson"), in her appeal of the final decision of the Commissioner of the Social Security Administration (defendant "Saul") to deny her claim for Supplemental Security Income benefits (SSI), contends the Administrative Law Judge's (ALJ) decision that she is not disabled is not supported by substantial evidence. Specifically, Wilson contends the ALJ erred in assessing her residual functional capacity ("RFC"). The parties have ably summarized the medical records and the testimony given at the administrative hearing conducted on August 27, 2019. The relevant period to be examined is from April 26, 2018, when Wilson filed her application, through November 7, 2019, the date of the ALJ's decision.

### *The Administrative Hearing:*

In response to questioning from the ALJ, Wilson stated she was 47 years old with the equivalent of a high school education.  She was 5'2" and weighed 214, and noted a weight gain after she stopped smoking.  Her past work was as a cleaner in a hospital and as a cashier at a convenience store.  Wilson lived with her daughter and three granddaughters, aged 2, 4, and 6.

Wilson confirmed that she was diagnosed with degenerative disc disease of the cervical spine and osteoarthritis of the right knee.  She indicated she saw a rheumatologist in June 2018 and was diagnosed with fibromyalgia, with a finding of 18 of 18 tender points.  Wilson stated she returned to this doctor twice after the diagnosis. Generally, Wilson testified "I've been hurting for years." (Tr. 31).  Wilson stated she was diagnosed with mild obstructive sleep apnea but did not use a CPAP for sleep assistance.  She had been treated for anxiety and depression, and was diagnosed with public anxiety in March 2019.  As a result, she "can't be left alone at any time by myself."  (Tr. 40).  She stated heat caused her shortness of breath, and strong perfumes and bleach irritated her.  According to Wilson, she began having panic attacks in 2016, and went to see her doctor in 2017 after having to call an ambulance "almost every other day" due to the attacks.  (Tr. 46).

Wilson takes prescription medication for anxiety, breathing, and arthritis issues,

and over the counter medication for stomach issues. She was prescribed anti-depressants (Effexor and Lexapro) but discontinued these because they caused her stomach problems. Wilson also had stomach problems and diarrhea as side effects from Diclofenac, prescribed for arthritis. She has COPD, which improved after she stopped smoking.

Wilson estimated she could lift 5 pounds, stand and walk for 15 minutes, and sit for 30-45 minutes before pain in her back and neck would arise. Wilson stated she used a cane, which was not a prescribed device.

Wilson described that on a typical day, she would get up at 6:30 a.m.; accompany her daughter to drop the grandkids off at daycare; rest; watch television in bed; do some housework, such as dishes and folding laundry; and see visitors, including her daughter and her boyfriend of 4 years. She states she does not read, cannot wash clothes or vacuum, and cannot go out by herself because she will have panic attacks.

Wilson described her symptoms as constant aching and shooting pain into her shoulders, constant aching in her back, and shooting pain down her legs. She received injections for back pain and tendinitis in her arms. Her hands are numb for 30 minutes after waking, and she requires someone to be in the bathroom with her when she showers. Her elbows swell. Wilson can fix her hair and use a microwave and oven,

but not fix dinner otherwise.  She shops for groceries, but only when accompanied by her boyfriend or another person, to avoid panic attacks.  When shopping, Wilson can lift can goods, but lifting a gallon of milk causes pain.  Wilson said she rarely goes out to eat, having last done so "a couple months" before the hearing.  (Tr. 51).  (Tr. 36-51).

David Elmore ("Elmore"), a vocational expert, testified.  The ALJ posed a hypothetical question to Elmore, asking him to assume a worker of Wilson's age, education, and experience, who could perform sedentary work with the following restrictions: avoid excessive exposure to airborne irritants, such as fumes, smoke, humidity, and extreme heat; could understand, remember, and carry out simple job instructions; could make judgments in simple work-related situations; could respond appropriately with co-workers and supervisors; could have occasional incidental contact that is not necessary to perform the work; avoid interaction with the public; could respond appropriately to minor changes in the usual work routine; and avoid exposure to hazards, such as unprotected heights and dangerous equipment, tools, machinery, or electrical shock.  Elmore testified that such a worker could not perform Wilson's past relevant work.  According to Elmore, such a worker could, however, perform jobs in the national economy, such as table worker, addresser, or document preparer microfilming.  Elmore stated that there would not be jobs available if the

4

hypothetical worker were off task 15% of the day, or if the worker was absent two or more days per month.  (Tr. 52-53).

### *ALJ's Decision:*

In his November 13, 2019, decision, the ALJ determined Wilson had the following severe impairments: degenerative disc disease of the cervical spine, osteoarthritis of the right knee, chronic bronchitis/COPD, obstructive sleep apnea, obesity, plantar fasciitis, fibromyalgia, anxiety disorder, and depressive disorder.  The ALJ specifically found Wilson did not have an impairment or combination of impairments that met or equaled a Listing.  In reaching this conclusion, the ALJ considered Listings 1.04, 3.02, 3.10, 12.04, and 12.06.  The ALJ addressed the paragraph "B" criteria, finding Wilson had a mild limitation in understanding, remembering, or applying information, and adapting or managing herself, and a moderate limitation in interacting with others, and with regard to concentrating, persisting, or maintaining pace.  The ALJ found that Wilson had the RFC to perform sedentary work with the restrictions posed to Elmore in the  hypothetical question detailed above.

The ALJ, citing the appropriate factors, assessed Wilson's subjective allegations, finding her statements "not entirely consistent" with the medical record and other evidence in the record.  (Tr. 16).   The ALJ specifically noted treatment

records showing improvement, treatment records showing normal findings, and medications and counseling which alleviated some of Wilson's depression and anxiety symptoms. The ALJ also addressed the opinions of the state agency psychological consultants, finding persuasive their opinions that Wilson would be able to do simple tasks in a low stress work environment that requires no more than occasional tasks requiring contact with others. The ALJ found partially persuasive the opinions of state agency medical consultants who opined that Wilson could perform light work with restrictions. And the ALJ found less than persuasive the opinion of Rochelle Johnson ("Johnson"), LPC, who opined that Wilson would miss more than three days work per month, and that she had extreme limitations in sustained concentration and persistence, social interaction, and adaptation. The ALJ held that Johnson's opinions were inconsistent with the mental status examination findings and with the course of treatment. The ALJ also found the opinion of Toni Garner ("Garner"), APRN, less than persuasive. Garner opined that Wilson would miss about two days a month from work and could never perform any postural activities. The ALJ found this opinion not supported and inconsistent with the record as a whole, stating:

> "While, the record demonstrates the claimant has COPD, degenerative disc disease and fibromyalgia, physical examinations throughout the record revealed that the claimant had a generally unremarkable musculoskeletal system, which showed a minimal decrease in the claimant's range of motion, she did not require the use or need any assistive devices to ambulate due to a normal gait pattern, she had

6

normal 5/5 strength, normal sensory deficits and normal reflexes."

(Tr. 19).

Finally, the ALJ found that Wilson could not perform any of her past relevant work.  Relying upon Elmore's expert testimony, however, the ALJ found Wilson capable of performing other jobs in the national economy.  Accordingly, the ALJ found Wilson was not disabled.  (Tr. 10-22).

### *Medical Evidence During Relevant Period:*

The relevant period commenced on April 26, 2018.

### 2018

On April 30, Wilson was seen by Dr. W. Robert VanScoy ("VanScoy") at Life Strategies Counseling.  Wilson, who had been a patient since November 2017, was seen for follow up after having previously been prescribed Effexor.  VanScoy performed a mental status examination, finding Wilson's mood was depressed, her thinking abstract, and she was without suicidal, homicidal, or self-harm ideation.  Wilson reported she was in no pain.  Wilson further stated she did not start an Effexor prescription for about a month, and only took the first dose at the hospital, fearing an allergic reaction.  Wilson reported after returning home from the hospital, she had severe diarrhea.  She told VanScoy she called an ambulance but the ambulance personnel refused to transport her.  Wilson then went to the ER, where the physician

told her to place Effexor on her list of medication allergies even though the diarrhea did not appear to be an allergic reaction. Wilson had previously taken Effexor without incident. VanScoy diagnosed Wilson with generalized anxiety disorder, agoraphobia, panic disorder, and major depressive disorder, recurrent, moderate. VanScoy's plan for Wilson indicated she had probable somatoform disorder and that it was "highly unlikely" that a single dose of Effexor resulted in the diarrhea. VanScoy prescribed Lexapro and discussed the medication with her. Wilson was noted to "ruminate over possibly having an allergy to the med [Lexapro] or being unable to tolerate it." (Tr. 308).

Wilson presented as a new patient to Dr. Shailendra Singh ("Singh") on June 7. Wilson stated she "hurts all the time in her knees and feet" and had joint swelling, fatigue, morning stiffness for 60 minutes, difficulty opening jars, and irregular sleep patterns. (Tr. 501). Singh performed a physical examination, ordered x-rays of the elbows and knees, and diagnosed osteoarthritis, chronic pain syndrome, medical epicondylitis, and fatigue. The x-rays were unremarkable. (Tr. 500-506).

Wilson went to the emergency department of Arkansas Methodist Medical Center ("AMMC") on July 28 after falling at home, claiming injuries to her neck, lower back, left hand, and left third finger. X-rays of the cervical spine, lumbar spine, and left hand showed no fractures, with soft tissue normal and joint spacing normal.

Mild degenerative changes were found in the cervical spine.  Wilson was advised to apply ice and heat and follow up with her physician, Dr. Robert Cagle ("Cagle").  (Tr. 559-564).

Wilson was seen by APRN Garner, at Cagle's office, on August 3.  Wilson reported her finger was improving but her depression and anxiety were worsening. Among other things, Garner's physical examination found normal gait, normal range of motion in all extremities, and normal range of spine.  Garner recorded that she would monitor Wilson's finger, and a follow up was to occur in 4 weeks.  (Tr. 536-539).  Wilson returned to Garner on September 4 with no new complaints.  Garner recorded improvement with Wilson's finger but still "very limited rom in that finger." (Tr. 533).  Garner scheduled Wilson for an MRI.  (Tr. 533-535).

On that same day Garner executed a Medical Source Statement – Physical.  On this form Garner found Wilson suffered from COPD, gluteal tendinitis, chronic low back pain, osteoarthritis, and degenerative disc disease.  Garner estimated Wilson could lift and carry less than 10 pounds, stand and walk about 2 hours a day, with a maximum of 1 hour without a break, and sit about 2 hours, with a maximum of 1 hour without a break.  Garner indicated Wilson was drowsy as a side effect of Valium.  She identified no restrictions on exposure to extreme heat, cold, high humidity, and sunlight, but found that Wilson should avoid all exposure to fumes, odors, dust, gas,

perfumes, soldering fluxes, solvents/cleaners, and chemicals.  Wilson would miss work about 2 days per month, according to Garner.  Garner cited as objective medical findings which supported her limitations Wilson's MRI lumbar spine, MRI thoracic spine, CT cervical spine, chest x-ray, and pulmonary function study.  (Tr. 546-548).

Also on September 4, a Medical Source Statement – Mental was executed by Rochelle Johnson ("Johnson"), a counselor at Life Strategies.  Johnson assigned Wilson a rating in twenty categories.  She found Wilson mildly impaired in three categories, moderately impaired in four categories, markedly impaired in five categories, and extremely impaired in eight categories.  The extreme ratings were primarily related to Wilson's ability to engage in social interaction and her ability to adapt.  Johnson estimated Wilson would miss more than three days per months due to her impairments.  Johnson listed Wilson's diagnoses as agoraphobia, panic disorder, generalized anxiety disorder, and major depressive disorder, recurrent, moderate.  Johnson remarked that Wilson's agoraphobia and panic escalates her ability to perform or engage in a normal setting due to her fear of leaving the home or of being alone at any time, and her anxiety increased due to panic and depression.  (Tr. 549-551).

A September 11 MRI of Wilson's left hand showed a chip-type fracture with marrow edema and mild inflammatory change of the soft tissue.  (Tr. 554-555).

Wilson returned to Garner for refills only, with no new complaints. Noting that Wilson had not been taking her Metformin, Garner warned her that she was at risk for high blood sugar readings.  (Tr. 773-775).

On October 15, Wilson saw Dr. Jeremy Swymm ("Swymm") at Dickson Orthopedics for issues with her finger.  Swymm indicated Wilson could choose to go to occupational therapy or perform range-of-motion exercises on her own.  Wilson chose the latter.  (Tr. 692-695).

VanScoy saw Wilson on October 24 for a psychiatric evaluation.  Wilson reported "terrible anxiety and panic."  (Tr. 716).  She had not taken the Lexapro prescribed in April for fear of a side effect or allergic reaction.  Wilson also recounted numerous ER visits for what she thought were heart problems but which were diagnosed to be anxiety issues.  She reported that Effexor had benefitted her but she stopped taking it because she felt better.  At the time of the visit, Wilson was only taking half of her prescribed dosage of Valium, stating she was overly sedated if she took all of it.  VanScoy's mental evaluation showed Wilson to be appropriate in appearance, sedated but cooperative, and with good concentration.  She exhibited intact short and long term memory, a dysphoric mood, dysthymic affect, abstract thought process, and thought content within normal limits.  She also reported chronically disturbed sleep, a stable appetite, and good insight and judgment.

VanScoy instructed Wilson to take a quarter of her Valium in the morning, then take the reminder later in the day. She was also instructed to try taking half of her Lexapro at first, then moving toward taking all of the Lexapro in a week or two. (Tr. 716-719).

Wilson returned to Garner on November 5 for medication refills, and she also complained of pain in her right side. Garner thought the pain was likely from a strained muscle. (Tr. 767-772).

Wilson went to AMMC on November 29 after burning three fingers by picking up a plastic toy to put into a fire. (Tr. 746-750).

Wilson saw Garner on December 5 for an annual Pap smear and follow up about her burned fingers. The fingers were healed. Wilson told Garner she did not want to take the Metformin, and Garner directed her to utilize a low carb diabetic diet and to lose weight to improve her blood sugar results. (Tr.763-766).

Wilson saw VanScoy on December 18. She informed him she had not taken her prescribed medication for fear she would end up in the ER, and had not taken the lower dose of Valium in the morning for fear something bad would happen. VanScoy directed Wilson to take half a tablet of Lexapro for a week, then to take a full tablet thereafter. (Tr. 704-707).

**2019**

Wilson saw Garner on January 5 for refills. She complained of congestion.

Garner again noted Wilson was not taking her Metformin, and repeated her earlier advice concerning diet and losing weight.  (Tr. 759-762).

Wilson presented at the ER at AMMC on February 4 complaining of anxiety. The physical exam reflected she was in moderate distress with normal heart rate and rhythm, normal heart sounds, and normal range of motion in her extremities.  She appeared depressed, with a flat affect, normal speech, cognition, thought process, insight and judgment.  She was discharged in good condition, having been diagnosed with anxiety reaction and benign palpitations.  (Tr. 724-731).  The following day Wilson returned to Garner for refills.  (Tr. 752-756).

On February 6, Wilson presented at St. Bernard's Medical Center emergency room with complaints of nausea, vomiting, diarrhea, and chest pain.  Her physical exam showed no apparent distress, normal breath sounds, regular heart rate and rhythm, and muscle strength of 5 in all extremities.  She was alert, with normal mood/affect, normal thought process, cooperative, and appropriate in appearance.  She was treated with Compazine,[1] which resulted in "significant improvements."  (Tr. 786).  She was discharged in good condition and instructed to follow up with her primary care physician.  (Tr. 781-787).

---

[1]

According to webmd.com, Compazine is used to treat severe nausea and vomiting. https://www.bing.com/search?q=compazine&src=IE-SearchBox&FORM=IESR3N.

Wilson saw VanScoy on February 12, telling him she had taken the Lexapro just a few times and had nausea, vomiting, and diarrhea. Wilson reported she was in no pain. VanScoy indicated she continued to have severe anxiety and somatic preoccupation. Wilson was to try Klonopin. (Tr. 707-709).

When seen by Garner on April 3, Wilson reported "her anxiety has improved" after the Klonopin was prescribed. (Tr. 852). Wilson also reported increased issues with arthritic pain in her knees and neck. The physical exam included the following findings: normal range of motion in neck/thyroid; normal gait; normal range of motion in extremities; right elbow tenderness; normal range of motion of spine; and tenderness to the left gluteal maximus, worse when raising from sitting to standing. Garner prescribed Naproxen. (Tr. 852-855).

Wilson followed up with VanScoy on April 26, reporting she was in no pain. She also stated she was taking 1/4 of the Klonopin with improvement in her anxiety but with lower heart rate and oxygenation levels. VanScoy "informed her this doesn't happen with this medication." (Tr. 833). VanScoy recommended a sleep study to address excessive daytime sleepiness and heroic snoring. Wilson was to follow up in 8 weeks. (Tr. 833-834).

The next day, April 27, Wilson went to AMMC for abdominal pain and diarrhea. She was diagnosed with diarrhea, acute left lower quadrant abdominal pain,

and mild dehydration.  She was given Lomotil for the diarrhea and instructed to push fluids and follow up with Cagle.  She was discharged in stable condition.  (Tr. 825-831).  On April 29, Wilson returned to AMMC complaining of vomiting and diarrhea. She was diagnosed with acute noninfectious gastroenteritis, discharged in stable condition, and again instructed to follow up with Cagle.  (Tr. 810-818).

When Wilson saw Garner on May 2, she had not had diarrhea in two days. Garner recorded the diarrhea as resolved and directed Wilson to use Imodium as needed.  Wilson was to follow up in 4 weeks.  (Tr. 848-851).

A May 7 MRI of Wilson's right knee showed degenerative change, possible partial tear of the anterior cruciate ligament, and fluid in the iliotibial band.  (Tr. 801-802).

A May 10 MRI of Wilson's abdomen showed a low density lesion, which had not changed size in the right lobe, and a nodule, unchanged, in the left adrenal gland. (Tr. 798-799).

Wilson saw Garner on June 3 for refills and for her complaints of chest congestion, cough, and fever.  Wilson mentioned to Garner for the first time that she had been having neck pain for at least a year and would like an MRI.  Garner noted a neck CT was performed in 2017, and it showed degenerative disc disease and osteoarthritis.  Garner's physical exam reflected that Wilson's neck was non-tender

with normal range of motion.  (Tr. 844-847).

A polysomnogram was conducted by Dr. Paul Vellozo ("Vellozo") on June 4, resulting in a diagnosis of mild obstructive sleep apnea.  Vellozo suggested a repeat sleep study with a trial of CPAP therapy and advised Wilson to lose weight.  (Tr. 861-863).  A June 6 MRI of her cervical spine showed degenerative disc disease and arthritis in her neck but no spinal stenosis.  (Tr. 843).

In a follow up visit with VanScoy on June 25, Wilson stated that when she was treated at the ER for diarrhea she was advised to stop all her medications.  She further indicated she recently restarted her Klonopin but was only taking ½ tablet twice a day.  She cited sleep issues with the Klonopin, saying she had trouble sleeping when taking ½ tablet but "I sleep all the time" if she took more than ½ a tablet.  (Tr. 869). VanScoy recorded Wilson had "various somatic complaints today."  (Tr. 869).  VanScoy prescribed Diazepam.  (Tr. 869-870).

On referral from Swymm, Wilson was seen on July 3 by Ann Koch ("Koch"), a physical therapist, for knee pain.  Koch found Wilson had some pain but no edema. (Tr. 885-886).  On July 8, Wilson returned to Koch, who noted back pain which rendered Wilson unable to lie supine for a long period.  Wilson was able to do multiple standing exercises with fair tolerance.  (Tr. 886-887).  She was unable to perform exercises on July 11, however, due to worsening back pain, and Koch

recorded she would notify Swymm of Wilson's inability to tolerate treatment.  (Tr. 887).

An August 7 MRI of Wilson's lumbar spine showed the following:

T12/L1: No disc herniation or spinal stenosis.

L1/L2: Minimal disc bulge without spinal stenosis or narrowing of the neuroforamen.

L2/L3: No disc herniation or spinal stenosis.

L3/L4: Minimal disc bulge without spinal stenosis, with facet hypertrophy causing mild narrowing of bilateral neuroforamen.

L4/L5: Diffuse disc bulge with facet hypertrophy causing narrowing of bilateral neuroforamen without spinal stenosis.

L5/S1: Diffuse disc bulge with facet hypertrophy without spinal stenosis or narrowing of the neuroforamen.

The impression was mild scoliosis with degenerative change of the lumbar spine with disc bulge without spinal stenosis.  (Tr. 880-881).

The relevant period ended on November 7, 2019.

***Wilson's argument that ALJ erred in assessing RFC:***

**Opinion Evidence**

Wilson first faults the RFC determination based on the ALJ's treatment of the opinion evidence provided by Garner, Johnson, and state agency medical consultants

Alice Davidson, M.D., and Lucy Sauer, M.D. ("Davidson" and "Sauer").

The opinions in Garner's September 4, 2018 Medical Source Statement – Physical and Johnson's Medical Source Statement – Mental are summarized above. Davidson and Sauer opined Wilson could perform light work with limitations on her ability to lift overhead bilaterally. (Tr. 55-70, 73-92).

It "is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his [or her] limitations." *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). Current regulations direct the ALJ not to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's own] medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920a

(2017).[2]   The ALJ is required to consider the consistency of all of the medical treatment records and opinions. "The more consistent a medical opinion(s) or prior

_____

[2]

The current regulations contrast with prior law which provided the opinion of a treating physician merited deference and "is to be given controlling weight where it is supported by acceptable clinical and laboratory diagnostic techniques and where it is not inconsistent with other substantial evidence in the record." *Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir. 2003).

administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."   20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2) (2017).

The question, therefore, is whether the ALJ placed "permissible weight" on the opinions. *Lawrence v. Saul*, ___ F.3d ___, 2020 WL 4375088, (8th Cir.) (July 31, 2020).   Here, the ALJ found Garner and Jones "less than persuasive" and credited Davidson and Sauer as "partially persuasive."   (Tr. 18-19).   The ALJ found that Garner's opinions of Wilson's physical limitations were not consistent with treatment records showing minimal decrease in range of motion, the absence of Wilson's need for assistive devices due to normal gait, her normal strength, normal sensory deficits, and normal reflexes.   In addition, the ALJ cited Wilson's ability to perform self-care tasks and other activities, including caring for family pets and shopping.

The ALJ found that Johnson's opinions about Wilson's mental limitations were not consistent with the generally normal mental status examinations or with the course of treatment, which included anti-anxiety medication and counseling but no inpatient, emergency, or partially hospitalized care.

The ALJ found that Wilson was capable of performing sedentary work, a lower exertional level than Davidson and Sauer opined she could perform.   The ALJ also

found that the record and the testimony did not support that Wilson required limitations in reaching or a need for postural limitations, citing physical examinations showing normal muscle strength, normal muscle tone, and full range of motion. While these findings suggest an ability to perform light work, the ALJ "limited the claimant to sedentary work based on the subjective complaints made at the hearing." (Tr. 18).

In summary, the ALJ was tasked with examining the entire record to formulate the RFC.  He was not required to choose the opinion of one medical professional to the exclusion of the others.  Here, the ALJ addressed the opinions submitted by Garner, Jones, Davidson, and Sauer, and gave valid reasons, with citations to the treatment record,  for his treatment of those opinions.  There was no error in this regard.

**Obesity**

Wilson states that obesity is a nonexertional impairment which might significantly restrict her ability to perform the full range of sedentary work.  Saul agrees that obesity might cause limitations.  The issue, however, is not the possibility of limitations stemming from obesity.  Instead, the ALJ explored whether functional limitations actually resulted from Wilson's obesity.  The ALJ found no treatment notes to support the presence of limitations resulting from obesity.  Even so, the ALJ

presumed Wilson's obesity had "a negative effect on her physical functioning in combination with her back and knee impairments." (Tr. 17). The ALJ thus factored in Wilson's obesity in finding that she could perform less than the full range of sedentary work. There was no error in the ALJ's treatment of Wilson's obesity and its effect on her RFC.

### Subjective Complaints

The ALJ found Wilson's subjective statements were not entirely consistent with the medical evidence and the other evidence of record. Wilson contends the ALJ erred by emphasizing she was, at times, improving, and by failing to adequately appreciate the limited nature of her daily activities. A review of the ALJ's analysis of Wilson's subjective complaints reveals a strong focus on the medical evidence. The objective medical evidence, one of many relevant factors which may be considered, strongly supports the ALJ's evaluation of Wilson's testimony. See 20 C.F.R. § 416.929. The numerous findings of normal gait, normal strength, normal reflexes, normal heart rate and rhythm, and normal range of motion support the ALJ's findings. While the ALJ mentioned improvement on Wilson's part, his analysis of her subjective assertions was not singularly tied to her improvement. Similarly, his recitation of Wilson's daily activities was merely one of many factors considered in his evaluation. There was no error in the ALJ's evaluation of Wilson's subjective

complaints.

### Mental Limitations

For her final challenge to the RFC determination, Wilson notes that the ALJ found, in considering the paragraph B criteria, that she had a moderate limitation in her ability to maintain concentration, persistence, or pace.  It was therefore error, according to Wilson, when the ALJ did not include this moderate limitation in his RFC finding or in his hypothetical question posed to Elmore, the vocational expert.

There was no error.  The paragraph B criteria is an analysis performed at Steps 2 and 3 of the sequential evaluation.  The ALJ wrote: "The limitations identified in the 'paragraph B' criteria *are not* a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 . . .  The mental residual functional capacity assessment used at steps 4 and 5 . . . requires a more detailed assessment of the areas of mental functioning." (Tr. 14) (emphasis added).  The ALJ, at step 4, found Wilson suffered from anxiety disorder and depressive disorder. Accordingly, he limited Wilson to work with simple job instructions, where one has the ability to make decisions/judgments in simple work-related situations, responding appropriately to minor changes in the work routine, with occasional, incidental contact with co-workers and supervisors, and with avoidance of interaction with the public. Thus, the ALJ performed his duty at step 4, fashioning the RFC to reflect Wilson's

limitations.  He was not obligated to simply duplicate his step 2 findings, inserting them at step 4.[3]   The process used by the ALJ was proper, as was his hypothetical question and the RFC finding which mirrored the hypothetical question.

Saul's ultimate RFC decision was supported by substantial evidence.  The Court's task is not to review the record and arrive at an independent decision, nor is it to reverse if some evidence supports a different conclusion.  The test is whether substantial evidence supports the ALJ's decision.  *See, e.g., Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012).  This test is satisfied in this case.

IT IS THEREFORE ORDERED that the final decision of Saul is affirmed and Wilson's complaint is dismissed with prejudice.

IT IS SO ORDERED this 5th day of May, 2021.

_____

UNITED STATES MAGISTRATE JUDGE

---

[3]

Saul points out that transferring the step 2 finding at step 4 is expressly forbidden by social security policy.  See 20 C.F.R. § 416.920a(c)(4) and Social Security Programs Operations Manual System DI 24510.065.  The Court's review of this section suggests that the guidelines are targeted at medical or psychological consultants, not at the ALJ.  Nevertheless, the ALJ did not err in proceeding as he did.